UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES H. CARPENTER, JR.,       )
                               )
            Plaintiff,         )
                               )
      v.                       )  Civ. Action No. 10-1069 (ABJ)
                               )
COLBERT I. KING *et al.*,      )
                               )
            Defendants.        )
                               )

**MEMORANDUM OPINION**

In this civil action brought *pro se*, plaintiff sues Colbert I. King, columnist for *The Washington Post* ("the Post"), for defamation. In addition, plaintiff purports to sue the newspaper's editor, senior editor, and owner, but he has listed them only as John Does I, II, and III. Defendants King and the Post move jointly to dismiss the complaint under Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff has filed a "contra-motion," accompanied by his declaration. Upon consideration of the parties' submissions, the court will grant defendants' motion to dismiss under Rule 12(b)(6).

**I. BACKGROUND**

Plaintiff is a prisoner confined at the Federal Correctional Complex in Coleman, Florida. His complaint arises out of three columns written by King concerning the death of a 29-year-old District of Columbia native named Keith Barnes, who was murdered by other inmates from D.C. while incarcerated in a federal prison. According to King's May 23, 2009, article, which was attached as Exhibit A to plaintiff's complaint, Barnes was serving a sentence for second-degree murder and conspiracy to commit armed robbery. He had entered a plea of guilty to those

1

charges and testified against his three co-defendants, one of whom was James Carpenter, the plaintiff in this action.

King's first column on the subject, published on May 21, 2005 ("A Witness Pays the Price in Prison," Exhibit C to the complaint), recounts the fact that Barnes was killed in a federal penitentiary in Beaumont, Texas, and that he had long feared that his life would be in danger if he was housed with other inmates from the District. The column reports on letters written to the U.S. Bureau of Prisons on Barnes's behalf by the Hon. Eleanor Holmes Norton, the Congresswoman from D.C., and it tracked the history of where Barnes had been incarcerated and how prison officials responded to the Congresswoman's inquiries. The article does not mention the plaintiff, and plaintiff does not allege that he was defamed by anything it said.

The second column, "Death Sentence, D.C. Style," dated May 28, 2005 (Exhibit B to plaintiff's complaint), provides more detail that King attributes to three sources: a named Justice Department official who had been the Assistant United States Attorney who prosecuted the case, an unnamed homicide detective who was familiar with the case, and a spokesman for the Barnes family. The article describes the robbery and murder of Israel "Dog" Jones and the roles played by the various participants, and it includes what the former prosecutor had to say about Barnes's acceptance of responsibility and his decision to testify against his co-conspirators.

The column states that four men, including Barnes and the plaintiff, went to Jones's apartment to rob him, but they found the apartment empty when they got there. Plaintiff James "Rat" Carpenter was identified in the column as the individual who "ordered two of the men to go find Jones." Once Jones was brought back to the apartment, King reports that Carpenter "took him into the bedroom, brandished a gun, and asked him for the money." Barnes was frightened by the threats and was leaving the building when Jones was shot. King wrote that Barnes "agreed to cooperate with the government in the prosecution of others, including

2

Carpenter, who was allegedly responsible for other shootings in the city," and added:

> Carpenter, while in the D.C. jail awaiting trial for the Jones murder, was also charged, on Sept. 24, 1997, with the April 7 stabbing death of another inmate, 19 year-old Quan Levonte Harris, also awaiting trial on a murder charge. Carpenter pleaded self-defense and was later acquitted.

Exhibit B to Plaintiff's Complaint at 2.

In the May 28, 2005, column, King recounts his conversation with the prosecutor, Peter Zeidenberg, who was struck by Barnes's remorse and decision to do the right thing. Zeidenberg explained that the decision to testify "took courage because Barnes had received notes from Carpenter threatening him and his family." *Id.* at 2.

The third column, "Our Prison System vs. the Terrorists," was published approximately four years later, on May 23, 2009. It concerned a plan then under discussion to house detainees from the military facility in Guantanamo Bay in federal penitentiaries. (Exhibit A to Plaintiff's complaint.) King was commenting on statements made by FBI Director Robert Mueller that detainees could radicalize other prisoners and pose a danger to national security, and he repeated the story of Kevin Barnes to illustrate his point that "[t]here's precedent for dangerous inmates getting their way in prison." The column noted, "[a]ccording to court papers, Carpenter wrote several letters to Barnes telling him he would be killed if he continued to cooperate." King also reports: "Last month, a Beaumont federal jury found Joseph Ebron of the District guilty of restraining Barnes while another inmate, Marwin Moseley, also of the District, stabbed Barnes 106 times." King notes that Barnes, his family, and a Member of Congress had placed federal prison authorities on notice of the risk Barnes faced from other D.C. inmates. He concludes, "If federal prison officials can be outfoxed by D.C. inmates, are they up to Al-Qaeda?"

Plaintiff brings this action in response to what he contends is the defamatory nature of the three columns, particularly the last. His complaint alleges, "[o]n May 23, 2009, King "wrote a

3

resummation of articles . . . concerning a D.C. native named Keith Barnes who was stabbed to death in a federal prison[.]" Compl. ¶ 4. He alleges that King "named plaintiff as James 'Rat' Carpenter as finally carrying out the death threats" to Barnes. *Id*. Complaining that the columns were "slanted to make plaintiff more dangerous than all international terrorist, and above being controlled by the Federal Bureau of Prisons, the FBI, and any other law enforcement," *id*. ¶ 10, plaintiff filed the instant action on June 25, 2010. He claims that the "false" statements jeopardize his efforts "to prove in a court of law that he is an innocent man under the law [because] the judges of the court system read the Washington Post." *Id*. Plaintiff seeks a total of $4 million in compensatory and punitive damages from King and $2 million in punitive damages from each John Doe defendant. *Id*. at 6.

## II. DISCUSSION

**1. Legal Standard**

Defendants argue that the complaint should be dismissed under Rule 12(b)(6) for failure to state a claim because plaintiff has neither pled the basic elements of libel nor shown that the challenged statements are actionable.[1] "To survive a [Rule 12(b)((6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face . . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks and citations omitted); *see Bell Atlantic Corp. v. Twombly*, 555 U.S. 544, 555

---

[1] Plaintiff casts his "Causes of Action" as "violations of the First and Fourteenth Amendments, the laws of the United States and the District of Columbia." Compl. at 5. As private actors, defendants cannot be held liable for constitutional violations. *See* 42 U.S.C. § 1983 (authorizing cause of action against individuals who violate constitutional rights while acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia . . . ."). Hence, the only cognizable claim is for libel.

(2007) (a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . .") (citations omitted).

In considering a motion to dismiss for failure to state a claim, a court generally "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94, (2007), and "grant plaintiff[] the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the court need not accept a plaintiff's legal conclusions or the inferences he draws if those inferences are unsupported by the alleged facts. *Id*. "Nor must the court accept legal conclusions cast as factual allegations." *Id*.; *see Warren v. District of Columbia*, 353 F.3d 36, 39-40 (D.C. Cir. 2004) (differentiating unacceptable conclusions of law from acceptable conclusions of fact). And while "[a] pro se complaint . . . must be held to less stringent standards than formal pleadings drafted by lawyers . . . even a pro se complaint must plead factual matter that permits the court to infer more than the mere possibility of misconduct." *Ning Ye v. Holder*, 644 F. Supp. 2d 112, 116 (D.D.C. 2009) (internal quotations and citations omitted).

In ruling on a Rule 12(b)(6) motion to dismiss, the court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which . . . judicial notice" may be taken. *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997).

**2. The elements of defamation**

To state a defamation claim, plaintiff must allege:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

5

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (quoting *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)).

Falsity and defamatory meaning "are distinct elements of . . . defamation and are considered separately." *White v. Frat. Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990). "The burden of proving falsity rests squarely on the plaintiff, [who] must demonstrate either that the statement is factual and untrue, or an opinion based implicitly on facts that are untrue." *Lane v. Random House*, 985 F. Supp. 141, 150 (D.D.C. 1995). It is an "absolute defense" to a defamation claim if the statements are "substantially true." *Ning Ye*, 644 F. Supp. 2d at 117.

Under District of Columbia law, "[a] statement is defamatory if it tends to injure [] plaintiff in his trade, profession, or community standing . . . by making him appear [to a reasonable reader as] odious, infamous, or ridiculous." *Id.* at 118 (internal quotation marks and citations omitted) (first alteration in original); *see White*, 909 F.2d at 518 ("The usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication to have been intended in the defamatory sense.") (quoting F. Harper, *et al*., The Law of Torts § 5.4 (1986)) (emphasis omitted).[2] However, the alleged

---

[2] Under judicially created doctrine, a plaintiff may be deemed "libel-proof" as a matter of law when his "reputation is so diminished at the time of publication of the allegedly defamatory material that only nominal damages at most could be awarded because the person's reputation was not capable of sustaining further harm . . . ." *Lamb v. Rizzo*, 391 F.3d 1133, 1137 (10th Cir. 2004) (*citing, inter alia, Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.D.C. 1978)). The doctrine has also been applied where "true statements in a particular publication" have so badly damaged a plaintiff's reputation "that minor false accusations within the same publication cannot result in further meaningful injury." *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 303 (2d Cir. 1986). This doctrine "is most often applied to plaintiffs with criminal convictions," *Stern v. Cosby*, 645 F. Supp. 2d 258, 270 (S.D.N.Y. 2009) (citation omitted), and with extensive criminal histories. *See Cardillo v. Doubleday & Co., Inc*., 518 F.2d 638, 639 (2d Cir. 1975) ("habitual criminal" with multiple convictions); *Ray v. Time, Inc.*, 452 F. Supp. 618, 622 (W.D. Tenn. 1976) ("convicted habitual criminal"); *Wynberg v. Nat'l Enquirer, Inc*., 564 F. Supp. 924, 928 (C.D. Cal. 1982) ("Criminal convictions with attendant publicity may make an individual libel proof") (citations omitted); *but see Mattheis v. Hoyt*, 136 F. Supp. 119, 124 (W.D. Mich. 1955) ("It is obvious that the publication of the article in question four years after plaintiff's

defamatory statement is not considered in isolation but rather must be examined in the context in which it appeared. *See Moldea v. New York Times Co.*, 22 F.3d 310, 313-15 (D.C. Cir. 1994) (*Moldea II)*; *Ning Ye*, 644 F. Supp. 2d at 118-19.

Furthermore, merely alleging that a statement was defamatory is not enough. The plaintiff must allege that the defendant "at least was negligent," *Vereen v. Clayborne,* 623 A. 2d 1190, 1195 (D.C. 1993) (citing *Phillips v. Evening Star Newspaper Co.,* 424 A. 2d 78, 80 (D.C. 1980)), because, as the Supreme Court has held, the First Amendment requires that states, while "defin[ing] for themselves the appropriate standard of liability," cannot "impose liability without fault" in defamation cases. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347 (1974). In actions for actual damages, the District of Columbia applies a negligence standard: the plaintiff must allege "a failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others, *i.e.,* a failure to make a reasonable investigation as to truth." *Kendrick v. Fox Television,* 659 A. 2d 814, 822 (D.C. 1995) (citations and internal quotation marks omitted).[3]

The Supreme Court has stated, "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest

---

conviction of the brutal murder of a young girl, even though it might have been in part untrue as to his admission of guilt, certainly did not affect or damage his reputation, unless possibly among his criminal associates in prison."). Given Barnes's reported testimony about plaintiff's lead role in the heinous crime (Compl. Ex. A) -- which plaintiff has not alleged to be false -- and plaintiff's resulting first-degree murder conviction and sentence of 50 years to life, it is highly doubtful that plaintiff's reputation could sustain any further harm from the alleged defamatory statements published at least three years after his conviction. *See* Compl. Ex. A (indicating that plaintiff was in BOP's custody by February 2002).

[3] Here, since the plaintiff also seeks punitive damages based on statements related to a matter of public concern, his standard may be even higher: the courts have suggested that he must allege the existence of actual malice. *See Ayala v. Washington,* 679 A. 2d 1057, 1063 n.3 (D.C. 1996).

7

and concern." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988). And the courts in the District of Columbia have been vigilant in upholding those principles.

> If the First Amendment's guarantees of freedom of speech and of the press are to ensure that these rights are meaningful not simply on paper, but also in the practical context of their exercise, then a newspaper Op-Ed column discussing a subject of public interest must surely be accorded a high level of protection, lest the expression of critical opinions be chilled. This is so because "[t]he reasonable reader who peruses [a] column on the editorial or Op-Ed page is fully aware that the statements found there are not "hard" news like those printed on the front page or elsewhere in the news sections of the newspaper. Readers expect that columnists will make strong statements, sometimes phrased in a polemical manner that would hardly be considered balanced or fair elsewhere in the newspaper . . . .

*Guilford Transp. Industries, Inc. v. Wilner*, 760 A.2d 580, 582-83 (D.C. 2000) (quoting *Ollman v. Evans* 750 F.2d 970, 986 (1984) (en banc) (plurality opinion), *cert. denied,* 471 U.S. 1127 (1985)). Notwithstanding the high level of protection accorded to opinion pieces, "there is no wholesale exemption from liability in defamation for statements of 'opinion'." *Moldea II*, 22 F.3d at 313 (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990)). Such statements "can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Id*. Thus, this court must look closely at the challenged articles and not rule simply on the ground that it is opinion pieces that are at issue.

### 3. Analysis

Plaintiff challenges statements contained in the second and third articles that King wrote about the death of Keith Barnes. While the clear focus of both articles is what King describes as a failure by the United States Bureau of Prisons, plaintiff contends that they were "false and demeaning" as to him. Compl. at 1. As the Supreme Court explained in *Iqbal,* "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at 1950.

"Where there are well pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to any entitlement to relief." *Id.* Proceeding in that fashion, the Court will dispense with further consideration of the conclusory introductory section of the complaint.

While they are highly conclusory as well, the court will address seriatim the allegations denoted as "Facts" in paragraphs 4 -11 of the complaint.

- In paragraphs 4 through 7, plaintiff takes issue with the May 23, 2009, column. In paragraph 4, he alleges that the article named *him* "as finally carrying out the death threats to Keith Barnes that the District of Columbia Court papers found plaintiff had made," and he states that "[t]here are no such court papers." But the May 23, 2009 article – which was attached to the complaint and therefore can be considered in ruling on the instant motion -- specifically names two other people, and not the plaintiff, as the individuals who carried out the murder of Keith Barnes. *See* Exhibit A to Compl. While the article does state, "[a]ccording to court papers, Carpenter wrote several letters to Barnes telling him he would be killed if he continued to cooperate," and the court is bound at this juncture to accept as true Carpenter's allegation that "there are no such court papers," this alone does not suffice to state a claim for defamation. In opposing the instant motion, plaintiff states under penalty of perjury that he did not threaten "Keith Barnes['] family or Keith Barnes [] [t]hat he would be killed if testifying [sic]." Pl.'s Contra-Motion to the Def.'s Mot. to Dismiss [Dkt. # 12-1], Declaration By James H. Carpenter, Jr., Under the Penalty of Perjury and With a Sound Mind ("Pl.'s Decl.") ¶ 2. However, King makes it clear in the columns that are appended to the complaint that in reporting on the subject, he was relying, at least in part, on the prosecutor, who specifically told him "Barnes had received notes from Carpenter threatening him and his

family," Exhibit B to Compl. The prosecutor told King that he had filed multiple pleadings with the court on Barnes's behalf detailing Barnes's cooperation and the risks that he faced, and King was also aware of a pending civil lawsuit about the matter. *Id.* Plaintiff has failed to allege that King was negligent or malicious in relying upon sources with knowledge when he made reference to the court papers. So, as to this allegation, the complaint lacks the necessary element of fault.

- Paragraph 5 of the complaint alleges that the "May 23, 2009 article placed plaintiff on the same footing as the radical Gitmo Prisoners who are alleged terrorist." This conclusory allegation does not warrant further analysis, and in any event, the allegation does not accurately characterize the May 23, 2009, column. In essence, King asked: if the U.S. Bureau of Prisons was *not even* able to manage D.C. inmates, how could it be depended upon to handle terrorists?[4] King's point was not that plaintiff could or should be compared to terrorists, but rather that the Bureau's ability to oversee prisoners in general was woefully deficient. But even if King had actually offered an opinion likening the plaintiff to a dangerous terrorist, such a statement would not be actionable since it would not be a statement of fact capable of being proved or rebutted. *See Guilford,* 760 A. 2d at 597 (quoting *Washington v. Smith,* 80 F. 3d 555, 556 (D.C. Cir. 1996)) ("A statement of opinion is actionable only if it has an explicit or implicit factual foundation and is therefore objectively verifiable"); *id*. at 596-7 (statements characterized as "rhetorical hyperbole are not actionable in defamation because they cannot reasonably be interpreted as stating actual facts about an individual.") (citation and internal quotation marks omitted).

---

[4] As plaintiff himself notes in paragraph 7, "[t]he May 23, 2009 article questioned if the FBI dealing with the plaintiff was up to dealing with Moslem Al-Qaeda."

- Sandwiched between two paragraphs that concern what King wrote in the May 23, 2009, article, paragraph 6 alleges: "That plaintiff had connections to reach into any U.S. Penitentiary and call for a murder on 24-hour notice." Assuming that plaintiff is alleging that King made a statement to that effect in the May 23, 2009 article, the exhibits attached to the complaint reflect that King did not do so. Nor did he explicitly write that Carpenter had called for the murder. On May 23, 2009, King wrote: "*D.C. inmates* easily tracked Barnes's movements in the federal prison system. *They* alerted inmates when he was headed to Florida. *They* sent word he was on the way to Beaumont, Tex. Within 24 hours of his arrival, *D.C. inmates* made him pay with his life." Exhibit A to Compl. at 2 (emphasis added). Thus, the column does not specify whether D.C. inmates turned against Barnes generally in light of his status as a cooperator or whether they were urged to do so by the plaintiff.[5]
- Paragraph 7 simply summarizes the May 23 article in a conclusory way, so under *Iqbal,* it is "not entitled to the assumption of truth." 129 S. Ct. at 1950. Furthermore, it does not complain of a factual statement that could be verified or shown to be "provably false." *See Guilford,* 760 A. 2d at 596.
- Paragraph 8 does not identify any defamatory statements but simply alleges that King's articles were approved by the editors and owner of the Post.

---

[5] It is true that a different column -- the May 29, 2005 article -- includes a quotation attributed to the unnamed homicide detective concerning plaintiff's ability to "get word through the prison system" about Barnes, but plaintiff does not make any allegations about this particular statement in his complaint. Absent allegations that the statement was false, <u>and</u> that it was negligently (and in the case of plaintiff's claims for punitive damages, maliciously) repeated by King, who was relying upon information provided to him (and to the court) by knowledgeable law enforcement personnel, it would not give rise to an action for defamation.

- In paragraph 9 of his complaint, plaintiff alleges that in the column published on May 28, 2005, King "wrote that [he] had killed a prisoner in jail, and was responsible for other shootings in Washington, D.C. [and] claimed plaintiff was found innocent due to self-defense, but the factual jury verdict was an acquittal." This allegation paraphrases the columns incorrectly and conflates two separate statements, neither of which is actionable. First, King wrote that the witness against plaintiff, Keith Barnes, "owned up to his involvement in the crime" and agreed "to cooperate with the government in the prosecution of the others, including Carpenter, who was *allegedly* responsible for other shootings in the city." Exhibit B to Compl. (emphasis added). King then noted parenthetically that plaintiff, "while in the D.C. jail awaiting trial for the Jones murder, was also *charged* . . . with the April 7 stabbing death of another inmate . . . also awaiting trial on a murder charge." King added: "Carpenter pleaded self-defense and was later acquitted." *Id*. at 2 (emphasis added). Plaintiff admits that he was in fact charged with murder as reported by King, but he states that he "did not plead self-defense, and the jury found me not guilty." Pl.'s Decl. ¶ 3. Even if King mischaracterized the specific nature of the defense plaintiff advanced at his trial, the column is substantially true: it fairly reports both that plaintiff was charged with, and acquitted of, the April 7 murder. *See Benic v. Reuters Amer., Inc.*, 357 F. Supp. 2d 216, 224 (D.D.C. 2004) ("A defendant can defend against a plaintiff's defamation claim by demonstrating that the 'gist' of the statement is true or that the statement is substantially true, as it would be understood by its intended audience.") (citing *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990)).
- In paragraph 10, plaintiff alleges generally that the three articles portray him as dangerous: "more dangerous than all international terrorist, and above being controlled by the Federal Bureau of Prisons, the FBI, and any other law enforcement." He

characterizes this portrayal as "false." This allegation is too conclusory to defeat a motion to dismiss for failure to state a claim on which relief can be granted, and based upon the court's review of King's pieces, it is not a fair summarization. Even if this allegation did accurately reflect King's opinion, it does not identify the sort of factually based statements that are actionable. *See Moldea,* 22 F. 3d at 316-17; *Guilford,* 760 A. 2d. at 599.

- In paragraph 11, plaintiff alleges that the articles are "false as to having any connection to the death of Keith Barnes, having any control over D.C. prisoners, or that plaintiff is factually guilty of the offense that he is in prison upon." He complains that "[t]hese articles have likely had some incorrect influence on the D.C. judiciary and right into the D.C. Court of Appeals as an ongoing matter at the time of filing this complaint." King's writings about the conviction for which plaintiff is now serving a sentence do not give rise to a cognizable claim for defamation since the law is clear that news reports on official court proceedings are privileged. *See Oparaugo v. Watts,* 884 A.2d 63, 81 (D.C. 2005) (citing *Phillips v. Evening Star Newspaper Co.,* 424 A. 2d 78, 88 (D.C. 1980)). Moreover, as indicated in note 2 above, the suggestion that the publication of the facts underlying an earlier criminal conviction harmed plaintiff's reputation does not state a claim for relief that is plausible on its face. Furthermore, the Court notes that paragraph 11 is highly conclusory, and, it does not specify any actionable statements within the articles to support this action. To the extent that plaintiff bases his claim on what he believes to be the facts implied by King's opinion, plaintiff fails to allege that King did not exercise the proper level of care prior to publication, and in fact, the record reflects that King interviewed and relied upon credible, knowledgeable sources of information. Absent the necessary allegations of fault, plaintiff's defamation claims are insufficient on

13

their face.

- Finally, paragraph 12 of the complaint is both a conclusory and an inaccurate characterization of the three articles. Plaintiff complains that they go "far beyond that facts of the death of Keith Barnes, even attacking his sentencing judge as the government and police see his sentence – as if plaintiff controlled the judge. All which is false and demeaning." Even assuming the articles did attack the sentencing judge – and the court concludes that as a whole, they do not -- such an attack would not be defamatory as to the plaintiff. Moreover, there is simply nothing in any of the articles suggesting that plaintiff had any "control" over the sentencing court, so he was not defamed by any such statement.

From the review above, the court determines that the complaint is not sufficient to raise a plausible claim that the defendants made false and defamatory – and non-privileged -- statements concerning the plaintiff. More important, the plaintiff has failed completely to allege any facts that would supply the necessary element of fault.

## CONCLUSION

For the foregoing reasons, and in reliance upon the parties' submissions, the court concludes that plaintiff has failed to establish the elements of his defamation claim. Therefore, the court will grant defendants' motion to dismiss for failure to state a claim upon which relief can be granted. A separate, final order accompanies this Memorandum Opinion.

_____s/_____
AMY BERMAN JACKSON
DATE: June 17, 2011                    United States District Judge